## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Todd Sweet, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Department of Veterans Affairs Office of Inspector General (VA OIG) and have been since February 2019. I am presently assigned to the VA OIG Manchester Resident Agency (51NH), Manchester, New Hampshire, where I investigate various crimes regarding the Department of Veterans Affairs (VA).

2. Prior to joining the VA OIG, I was a Special Agent with the United States Secret Service (USSS), Newark Field Office, from 2010 to 2017 and the Presidential Protective Division (PPD) from 2017 to 2018. During my tenure as a USSS Special Agent, I conducted multiple investigations involving bank fraud, access device fraud, counterfeiting, hacking and network intrusion cases, which were complex multi-jurisdictional investigations. While serving as a Special Agent with the USSS, I received computer, network intrusion and other technical training.

3. Since joining the VA OIG, I have conducted and participated in several investigations involving VA programs. I have gained experience in conducting such investigations through formal training, on-the-job training, as well as consultation with experienced Agents. During the course of my career, I have participated in the execution of numerous search warrants, seizure warrants and arrests of individuals for violations of federal law.

4. I make this affidavit in support of an application for a criminal complaint charging Gregory P. Heimann, Jr. (Heimann) with making a false, fictitious, or fraudulent statement or representation, in violation of 18 U.S.C. § 1001(a)(2).

5. The facts set forth in this affidavit are based upon my personal knowledge, information obtained during my participation in this investigation including information provided by other investigators, my review of records related to this investigation, and information gained through my training and experience. This affidavit is intended to provide the facts necessary for a determination of probable cause for the application for a criminal complaint.

## PROBABLE CAUSE

6. In August 2022, I received a referral relating to Heimann (DOB xx/xx/1974) based on a proactive review by the VA OIG of beneficiaries who had lost the use of either their hands or feet.

7. I have reviewed records from the Veterans Benefits Management System (VBMS) relating to Heimann. Those records show that Heimann was enlisted in the U.S. Army from November 30, 1993, through January 29, 1997. From April 1997 to May 2005, Heimann was enlisted in the U.S. Army National Guard.

8. I have also reviewed records from VBMS pertaining to Heimann's claims for VA benefits and the VA's decisions associated with those claims. The below is my summary of some of the relevant and pertinent information in those records, but it is not a complete recitation or analysis of the information contained in those records.

   a. Records from the VA show that in 1996, Heimann submitted his first claim for VA benefits for issues relating to a torn meniscus, hearing loss, a back

2

   injury in 1995, and a finger chip fracture. In March 1997, the VA denied these claims for deafness, a knee disorder, and a back injury, for a lack of medical record justification but granted his claim for a finger chip fracture with a 0% disabling rating.

b. In 2004, Heimann submitted a statement to reopen his claims for benefits relating to his back, tinnitus, and knees.

c. In October 2004, a clinician examined Heimann and diagnosed him with thoracic lumbar fibromyositis and cauda equina syndrome. The clinician noted that there were minimal physical findings, but the diagnoses were "at least as likely as not service related because there is evidence in the medical record explaining the relationship" between the conditions and the injury in 1995. The clinician documented that Heimann's gait was "abnormal," and that he used a metal cane and a "scooter for long distances such as the grocery store." Finally, the clinician noted that the subjective complaint of pain "is out of proportion to physical findings."

d. In January 2005, the VA granted Heimann's claim with respect to thoracic lumbar fibromyositis with cauda equina syndrome, with an evaluation of 40 percent disabling (effective March 3, 2004).

e. Following a claim by Heimann in 2006, a clinician examined him relative to his back condition in June 2006. The clinician documented that Heimann required a wheelchair for ambulation, he could not walk, and he had decreased function of his legs and ankles. He was diagnosed with intervertebral disc syndrome and neuropathy of legs secondary to cauda

equina syndrome. In December 2006, the VA issued a rating decision granting Heimann benefits back to May of 2005 for certain conditions, including evaluation of thoracolumbar fibromyositis with cauda equina syndrome (maintained at 40% disabling). The VA also found that Heimann was entitled to a special monthly compensation based on the loss of use of his left foot (from April 21, 2006), and that he was entitled to automobile and adaptive equipment.

f. In August 2008, Heimann submitted a claim to the VA relating to unemployability and another medical condition. Following an examination in October 2008, the clinician concluded that there was no change in Heimann's diagnosis of thoracolumbar fibromyositis with cauda equina syndrome and that it was a permanent condition (meaning that his disabilities were not expected to improve due to it being related to nerve injury and that periodic re-evaluations would not be needed) at that time. The clinician also noted that Heimann stated he could not support himself on his legs and that he was considered a Paraplegic and required assistance with all transfers in and out of his wheelchair, and with all daily requirements of life. During the exam, clinical staff had to transfer Heimann from his wheelchair to the exam table, as Heimann indicated he could not transfer himself.

g. On January 16, 2009, the VA issued a rating decision[1] for Heimann finding that he had a service-connected disability for loss of use of both feet, which was evaluated at 100% disabled, effective October 21, 2008. The VA also found Heimann to be entitled to special monthly compensation for loss of use of bilateral lower extremities from October 21, 2008.

h. In February 2022, the VA sent a letter to Heimann indicating that he received approximately $5,000 per month in VA disability benefits, that he was permanently disabled, and was approved to receive a special home adaptation grant.

9. Since January 2016, the VA has paid approximately $244,075 in disability benefits to Heimann based solely on the loss of use of both feet.

10. Through my investigation, I reviewed open-source social media accounts related to Heimann. I found one Facebook account (https://www.facebook.com/greg.heimann.50), which appears to belong to Heimann. The name on the account is Greg Heimann and the profile picture for this account appears to closely resemble Heimann's photograph on his VA Veteran Health Identification Card (VHIC), as well as his Maine Driver's License (DL) photo. In looking at the posts on the Facebook account, I located a photograph posted on June 12, 2010, by Heimann that appears to show Heimann standing without the use of any adaptive

---

[1] A VBA rating decision is based on evidence gathered from Veterans Health Administration (VHA) and Department of Defense (DOD) medical records, as well as medical opinions generated by VHA and contract clinicians during C & P exams. In instances where objective evidence is lacking or unavailable, subjective evidence in the form of beneficiary statements can be used. These clinical opinions are reviewed by VBA Raters to determine the appropriate percentage of disability for each beneficiary, for each uniquely rated disabling condition. These individual ratings are combined to tabulate the total disability rating, and consequently their monthly compensation.

equipment. I also saw a post by Heimann on October 12, 2012, that said he was "back up in running," "getting better with each passing day," and taking medications for a chest infection. The post further stated that he was leaving the next day for an elk hunt with his boys.

**Heimann's VHIC and DL photos:**




11. In June 2019, the Walla Walla Sheriff's Office responded to a report of an assault or fight involving Heimann in Prescott, Washington. I have obtained and reviewed video surveillance of that incident, which shows Heimann walking and standing without assistance, pushing and fighting with another person, carrying various items, and climbing a ladder. Some still photographs from that surveillance appear below:





12. In July 2019, the Walla Walla Police Department responded to a report of an assault involving Heimann in Walla Walla, Washington. I obtained and reviewed body-worn camera footage from the officer who responded to this incident, as well as surveillance camera footage of the incident. In the footage of the incident, Heimann can be seen walking across the road and pushing and then punching his neighbor.

13. From interviews with known associates of Heimann's in the State of Washington conducted by other Specials Agents with the VA OIG in November 2023, it has been determined that Heimann moved from the State of Washington to the State of Maine in or around 2021.

14. In August 2022, from criminal history queries, I learned that Heimann was issued a Maine DL that expires in 2027, with a primary address of 18 Depot Street, Princeton, Maine. Among other things, I learned that Heimann was issued a warning on July 17, 2021, by Maine Game Warden Brad Richard for operating an All-Terrain Vehicle (ATV) on a public road.

15. I spoke with Warden Richard in August 2022, and I was advised that Princeton, Maine, is a small town, and that Warden Richard was familiar with Heimann. Warden Richard reported that Heimann lived across the street from the town office and usually walked to the town office for meetings. Open-source queries using Google Maps determined that Heimann lived approximately 200 feet from the town office.

16. On September 12, 2022, Warden Richard observed and recorded Heimann drag a chicken coop across his lawn. I received and reviewed a copy of the video from Warden Richard, which appears to show Heimann dragging a plastic chicken coop for

several feet and walking without difficulty in his yard. Still photographs of the video footage appear below:




17.   I coordinated with a Veterans Benefits Administration (VBA) specialty team and showed this team some of the evidence developed during this investigation to determine if a re-examination of Heimann's disabilities was warranted. The specialty team liaised with VBA, and VBA decided to conduct a re-examination to evaluate any improvements in Heimann's stated conditions. This examination was scheduled for May 9, 2023, with a contract clinician in Houlton, Maine.

18.   On May 9, 2023, I traveled to the location of the examination and observed a large mobile van with a "QTC" logo parked in the parking lot at the examination address in Houlton. Through open-source searches, I learned that QTC purports to be the largest provider of disability and occupational health examination services.

    a. At approximately 10:10 a.m., on May 9, 2023, I observed Heimann drive into the parking lot and park near the QTC van. I then saw Heimann unload a wheelchair while seated in the driver's seat of his truck and exit

8

the vehicle into the wheelchair. Heimann wheeled himself over to the QTC van and onto a lift, which raised him up so he could wheel into the van. After about an hour, I saw Heimann use the wheelchair lift to leave the van. I observed Heimann wheel himself to his vehicle and climb into the driver's side of the truck, loading the wheelchair into the truck while seated. A photograph from my surveillance of Heimann appears below:



b. At approximately 11:15 a.m., Heimann left the parking lot, and me and another VA OIG agent (Resident Agent in Charge [RAC] Matthew Kidd, 51NH) followed Heimann to a hardware store in Danforth, Maine. At the store, I saw Heimann standing (without the use of any adaptive equipment) outside of his truck in the parking area of the hardware store. RAC Kidd entered the store and saw Heimann standing, walking around, and shopping at the hardware store. RAC Kidd captured video of Heimann inside the store, and a still photograph is included below. We then followed Heimann to his residence and I saw Heimann standing unassisted in his yard.

9




19. During this clinical exam on May 9, 2023, Heimann told the examiner that he was "wheelchair bound" and unable to bear weight with his legs. When asked how often he required the use of a wheelchair, Heimann noted that it was constantly. Heimann told the examiner that he had been wheelchair bound since 2004 and could no longer walk.

20. On May 19, 2023, another VA OIG agent and I interviewed this contract clinician via Microsoft Teams. This contract clinician confirmed that Heimann had told him he was wheelchair bound for nearly 20 years, and that he could not walk or stand. During this interview SA Sweet showed this contract clinician excerpts of video surveillance footage from 2019 related to Heimann fighting with other people, and this contract clinician stated "Oh my gosh! No balance issues at all!" and noted that Heimann "acted like he couldn't move" during the VA Compensation and Pension (C & P) exam. When this contract clinician was shown the video of Heimann dragging a chicken coup across his yard, he stated "No impairment at all. Wow." This contract clinician also noted that Heimann claimed that another person drove him to this C & P exam as he could not drive himself. When asked if this video evidence was in-line with how Heimann presented during his C & P exam the contract clinician stated, "This is completely out of line with what he stated was going on with him symptomatically."

10

21. During the investigation, I obtained and reviewed video surveillance of transactions completed by Heimann at Walmart and Machias Savings Bank locations in Maine. From my review of that surveillance, I have seen Heimann walking and standing on multiple occasions without the use of any adaptive equipment. Included below are some still photographs from that surveillance that is contemporaneous to his C & P exam:

**March 2023 (Machias Savings Bank, Maine)**



**April 2023 (Machias Savings Bank, Maine)**



### May 2023 (Machias Savings Bank, Maine)



22. One of the above still photographs from May 2023 occurred on May 4, 2023 (five days prior to Heimann's C & P exam in Houlton, ME), and Heimann was seen walking without the use of any adaptive equipment for approximately 190 feet (per Google maps) from where he parked his truck to an exterior Automated Teller Machine (ATM).

23. On May 13, 2023, Heimann was observed on Walmart Surveillance cameras shopping for approximately one hour and 20 minutes while walking, shopping, and lifting various items, and pushing a loaded shopping cart. Again, this occurred four days after Heimann presented for a VA C & P exam in a wheelchair and stated that he has been wheelchair bound since 2004 and could not walk. At no time on this surveillance footage can Heimann be seen utilizing any adapting equipment. Still photographs of Heimann's shopping trip at Walmart on May 13, 2023, appear below:



24. On February 22, 2024, I interviewed Heimann in Bangor, Maine, along with Special Agent Michael Gibson, Social Security Administration, OIG. I explained to Heimann that we wanted to speak with him and asked if he would be willing to speak with us. Heimann consented to a non-custodial, voluntary, recorded interview. During this interview, Heimann was in a wheelchair and stated he came to be disabled from a crushing injury in 1995 while on active duty in Hawaii. Heimann stated he reinjured his back around 2002 while in the National Guard. Heimann stated that he began using a wheelchair around 2006. When asked if he's been in a wheelchair since 2006, Heimann replied: "I'm in a wheelchair most of the time." Heimann stated sometimes he can use forearm crutches and walk very short distances. Heimann stated he would not be able to walk outside to his truck. After being warned by agents that it was a federal crime to lie to investigators, and being asked if he was in a wheelchair 100% of the time, Heimann stated that it was "quite a bit of the time." When asked if his condition improved since 2008, Heimann said no. I explained some of the evidence to Heimann developed during my investigation (including that he had been seen walking, driving, fighting, and shopping). When asked why he would appear in a wheelchair for a medical exam and be seen later that same day walking, Heimann replied "stupidity."

25. During the interview, Heimann ultimately admitted that his condition began to improve around 2015 / 2016. When I asked him if money was a motivation for this conduct, Heimann said "yeah." Heimann was also asked if there were statements in the examination reports that were not supported by fact, and Heimann replied "oh yeah." Heimann stated he was "afraid of losing" his lifestyle and that he didn't want his benefits to change. I asked Heimann to gauge the accuracy of his statements to the government during his clinical exams, and Heimann stated that they "need to be re-worked."

26. The evidence obtained during my investigation shows that Heimann's statements to the clinician during the C & P examination on May 9, 2023, regarding his inability to walk and his representation that he was wheelchair bound, were false and inaccurate. As a result of these false statements, Heimann has continued to receive disability benefits from the VA, including special monthly compensation for loss of use of both feet, to which he otherwise would not be entitled.

27. Since VHA was unable to find structural evidence utilizing advanced imaging techniques (Magnetic resonance imaging [MRI] and Computerized Tomography [CT] scans) during Heimann's VHA medical appointments to support the diagnosis which resulted in Heimann receiving a special monthly compensation for the loss of use of both feet, VHA and contract clinicians relied on subjective statements provided by Heimann about his abilities and disabilities, along with other things. If Heimann had provided accurate statements during his C & P exam on May 9, 2023, this would have triggered an administrative review of his benefits to be re-aligned to his current level of disability. By providing false statements about his abilities, Heimann

14

deprived the government of the opportunity to have an accurate accounting of his abilities and disabilities, therefore fraudulently inflating his VBA monetary benefits.

28. As a result, there is probable cause to believe that Heimann committed the offense of making a false or fraudulent statement to the VA in violation of 18 U.S.C. § 1001(a)(2).

## CONCLUSION

29. Based on the foregoing, I submit that probable cause exists to believe that on May 9, 2023, Gregory P. Heimann, Jr., willfully and knowingly made a materially false, fictitious, or fraudulent statement or representation in a matter within the jurisdiction of the VA, a federal agency within the executive branch of the United States, in violation of 18 U.S.C. § 1001(a)(2). I respectfully request that the Court issue a criminal complaint charging him with this offense.

Dated at Bangor, Maine, this 29th day of April, 2024.

_____
**Todd Sweet**
Special Agent, OIG
U.S. Department of Veterans Affairs

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedure

Date: Apr 29 2024

City and state: Bangor, ME

Judge's signature

John C Nivison U.S. Magistrate Judge
Printed name and title